IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STANLEY HOFFMAN,

    Plaintiff,

v.                                             Case No. 6:14-CV-1279-JTM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

    Defendant.

**MEMORANDUM AND ORDER**

Plaintiff Stanley Hoffman seeks review of a final decision by defendant, the Commissioner of Social Security, denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Upon review, the court finds that the Commissioner's decision was supported by substantial evidence contained in the record. As such, the decision of the Commissioner is affirmed.

**I.    Factual and Procedural Background**

Plaintiff filed for DIB on October 19, 2010, alleging disability beginning December 17, 2008. His claim was denied initially on March 24, 2011, and upon reconsideration on June 15, 2011. Plaintiff timely filed a request for an administrative hearing, which took place on July 19, 2012, before Administrative Law Judge ("ALJ") Michael R. Dayton. The ALJ held a supplemental hearing on January 16, 2013. Plaintiff, represented by counsel, appeared and testified. Also testifying was plaintiff's daughter, Jennifer Newst, and Vocational Expert ("VE") Bonnie Ward.

The ALJ issued his decision on February 1, 2013, finding that plaintiff suffered from a variety of severe impairments, including degenerative changes to the cervical and lumbar spines, status post multiple remote knee surgeries, carpal tunnel syndrome, depression, and borderline intellectual functioning.  Despite these findings, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. He concluded that plaintiff retained the residual functional capacity to perform light work with the following additional restrictions and/or limitations: (1) stand and/or walk and sit for six hours during an eight-hour workday; (2) frequently balance and climb ramps and stairs; (3) occasionally climb ladders, ropes, and scaffolds; (4) occasionally stoop, kneel, crouch, and crawl; (5) occasionally reach overhead with the bilateral upper extremities; (6) no concentrated exposure to extreme cold and vibrations; (7) understand, remember, and carry out simple instructions; (8) can attend and concentrate adequately to carry out simple tasks; (9) avoid workplace hazards; and (10) can adapt to normal changes in a workplace within the stated limits.

The ALJ therefore concluded that plaintiff was not under a disability during the relevant time period.  This decision became the final decision of the Commissioner on June 23, 2014, after the Appeals Council denied review.  On August 27, 2014, plaintiff filed a Complaint in the United States District Court for the District of Kansas seeking reversal and the immediate award of benefits or, in the alternative, a remand to the Commissioner for further consideration.  Given plaintiff's exhaustion of all administrative remedies, his claim is now ripe for review before this court.

In his brief, plaintiff alleges that the ALJ failed to: (1) find plaintiff illiterate and therefore disabled, (2) accord proper weight to a non-treating consultative examiner, (3) perform an appropriate credibility analysis, and (4) pose a complete hypothetical to the VE.

## II.     Legal Standard

Judicial review of the Commissioner's decision is guided by the Social Security Act (the "Act") which provides, in part, that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must therefore determine whether the factual findings of the Commissioner are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "Substantial evidence is more than a scintilla, but less than a preponderance; in short, it is such evidence as a reasonable mind might accept to support the conclusion." *Barkley v. Astrue*, 2010 U.S. Dist. LEXIS 76220, at *3 (D. Kan. July 28, 2010) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)). The court may "neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.3d 799, 800 (10th Cir. 1991)).

An individual is under a disability only if he or she can "establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months." *Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1306-07 (D. Kan. 2007) (citing 42 U.S.C. § 423(d)). This impairment "must be severe enough that she is unable to perform her past relevant work, and further cannot engage in other substantial gainful work existing in the national economy,

considering her age, education, and work experience." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *3 (citing *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002)).

Pursuant to the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a). The steps are designed to be followed in order. If it is determined, at any step of the evaluation process, that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4.

The first three steps of the sequential evaluation require the Commissioner to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged disability; (2) whether the claimant has a severe, or combination of severe, impairments; and (3) whether the severity of those impairments meets or equals a designated list of impairments. *Lax*, 489 F.3d at 1084; *see also Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4-5 (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)). If the impairment does not meet or equal one of these designated impairments, the ALJ must then determine the claimant's residual functional capacity, which is the claimant's ability "to do physical and mental work activities on a sustained basis despite limitations from her impairments." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5; *see also* 20 C.F.R. §§ 404.1520(e), 404.1545.

Upon assessing the claimant's residual functional capacity, the Commissioner moves on to steps four and five, which require the Commissioner to determine whether the claimant can either perform his or her past relevant work or whether he or she can generally perform other work that exists in the national economy, respectively. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5 (citing *Williams*, 844 F.2d at 751). The claimant bears the burden in steps one through four to

prove a disability that prevents performance of his or her past relevant work. *Lax*, 489 F.3d at 1084. The burden then shifts to the Commissioner at step five to show that, despite his or her alleged impairments, the claimant can perform other work in the national economy. *Id*.

### III.   Analysis

**A.   Failure to find plaintiff illiterate**

Plaintiff first alleges that, pursuant to Grid Rule 202.09, based on his age, limitation to only unskilled work, and inability to read, he should have been deemed illiterate and therefore disabled. In support of his argument, plaintiff cites to his own testimony, as well as that of his daughter, that he had limited education, never learned to read, and required assistance to fill out any paperwork.

"Limited education" and "illiteracy" are different terms which are defined separately under the Social Security Regulations. Under the regulations, these impairments are not interchangeable and one is not equivalent to the other. *See Slaughter v. Colvin*, 2014 U.S. Dist. LEXIS 97789, at *12 (D. Kan. July 18, 2014).

> (1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.
>
> . . .
>
> (3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

20 C.F.R. § 404.1564(b).

The ALJ found that plaintiff "has a limited education and is able to communicate in English." Dkt. 8-3, at 29.[1]  Plaintiff's daughter testified that she would have to fill out plaintiff's workplace timesheets and pay his bills. Dkt. 8-3, at 54-55.  She attributed plaintiff's dependence in such matters to the fact that plaintiff's writing was illegible, he had bad vision (for which he did not wear prescribed corrective lenses), and "just never learned to read." Dkt. 8-3, at 54-55.

However, plaintiff's previous employer stated that there had been no indication that plaintiff had a lower reading level or was functionally illiterate while plaintiff was on the job. He noted that, in plaintiff's job, there was "certain paper work that needed to [be] completed and it was completed."  Dkt. 8-4, at 25.  In a Work History Report, plaintiff reported that he was required to write and complete reports for his job and that he was a lead worker who supervised one to two other workers.  Dkt. 8-7, at 6, 29-30.  On a Disability Report, plaintiff indicated that he could read and understand English and write more than just his name.  Dkt. 8-7, at 12.  He also reported that he did not take special education classes, was able to obtain his driver's license, and used glasses for "reading and driving."  Dkt. 8-7, at 14, 44, 47.  On a Function Report, plaintiff indicated that he could pay bills, count change, and handle a savings account. Dkt. 8-7, at 44.

Plaintiff's reports of his education level vary.  He testified that he dropped out of school in the ninth grade, thereby implying that he completed at least eighth grade.  Dkt. 8-3, at 42. However, a Disability report shows that plaintiff completed only seventh grade.  Dkt. 8-7, at 14. Either way, plaintiff's level of school is within the general understanding of "limited education" as presented in the Social Security regulations, and is contrary to the general understanding therein that "illiteracy" presumes little or no formal schooling.

---

[1] There is no allegation that plaintiff cannot communicate in English.

Furthermore, plaintiff testified that he has a driver's license, thereby at least implying that he was able to pass the written driver's test. Dkt. 8-3, at 44. There is no evidence in the record to the contrary. Plaintiff's assertion was supported by his daughter, who testified that she asked plaintiff to drive her son to the doctor's office. Dkt. 8-3, at 59.

The court therefore finds that it was not error for the ALJ to find that plaintiff has a limited education but is not illiterate. Plaintiff's first assignment of error is dismissed.

**B.      Failure to assign proper weight to opinion of a non-treating consultative examiner**

Plaintiff next alleges the ALJ failed to assign proper weight to the opinion of non-treating consultative examiner Dr. Jerold Albright. Dr. Albright was retained by plaintiff and his attorney on November 13, 2009. Dkt. 8-13, at 4. During an examination, Dr. Albright reported that plaintiff had moderate tenderness of the paraspinal muscles in the lower thoracic area upon palpation with a slightly limited range of motion. Dkt. 8-13, at 4. Plaintiff also had some difficulty with twisting motions. Dkt. 8-13, at 4. Based on this examination, Dr. Albright concluded that plaintiff would need future treatment and estimated "his permanent disability at approximately 40%." Dkt. 8-13, at 4. He limited plaintiff to a weight limit of ten pounds with very limited bending and twisting. Dkt. 8-13, at 4.

Plaintiff returned to Dr. Albright on September 17, 2010. Dkt. 8-13, at 3. This time, Dr. Albright noted marked tenderness upon palpation in the paraspinal muscles and very slight tenderness upon palpation to the thoracic spine. Dkt. 8-13, at 3. Plaintiff had only slightly decreased range of motion with no radiation. Dkt. 8-13, at 3. Dr. Albright concluded that plaintiff could not return to any type of physical or manual labor and would require the following restrictions: (1) weight limit of ten pounds, (2) very limited bending and twisting, (3) frequent

7

breaks that might require resting or lying down, and (4) the ability to change positions frequently.  Dkt. 8-13, at 3.

Plaintiff saw Dr. Albright a third time on July 24, 2013, more than five months after the administrative hearing.  This time, Dr. Albright noted that plaintiff did not have any money and was "obviously disabled."  Dkt. 8-14, at 77.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s) including the claimant's symptoms, diagnosis and prognosis."  *Terry v. Colvin*, 2015 U.S. Dist. LEXIS 9446, at *5 (D. Kan. Jan. 28, 2015) (quoting 20 C.F.R. § 416.927(a)(2)). "Such opinions may be not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations."  *Id*. (citing 20 C.F.R. § 416.927(c)); *see also* SSR 96-5p, 1996 SSR LEXIS 2 (July 2, 1996).

"A physician or psychologist who has treated a patient frequently over an extended period of time (a treating source) is expected to have greater insight into the patient's medical condition, and his opinion is generally entitled to 'particular weight.'"  *Terry*, 2015 U.S. Dist. LEXIS 9446, at *5 (citing *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003)).  But, "the opinion of an examining physician (a non-treating source) who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion."  *Id*. at *5-6 (citing *Doyal*, 331 F.3d at 763).  Opinions of non-treating sources are "generally given more weight than the opinions of non-examining sources who have merely reviewed the medical record."  *Id*. at *6 (citing *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004)).

8

The ALJ generally assigned Dr. Albright's opinion little weight, noting that it was not consistent with other medical reports contained in the record. Dkt. 8-3, at 28. However, the ALJ did agree with Dr. Albright's conclusion that plaintiff could not return to his heavy exertional level position. Dkt. 8-3, at 28. Nevertheless, the ALJ found no basis to support the ten-pound weight limit or the limitations on alternation and rest periods. Dkt. 8-3, at 28. The ALJ also completely disregarded Dr. Albright's assessment of 40% disability, noting that such a conclusion was a finding reserved solely to the Commissioner. Dkt. 8-3, at 28.

The court finds that the ALJ provided specific, legitimate reasons for according only little weight to Dr. Albright's opinion. For example, the ALJ noted that there was "little structural evidence of a problem with [plaintiff's] back." Dkt. 8-3, at 26. Radiological testing from 2010 showed only mild degenerative disc disease of the cervical and lumbar spines with some moderate bilateral neuroforaminal stenosis but no central canal stenosis. Dkt. 8-13, at 83-84. Updated testing from March and November 2010 reflected no change. Dkt. 8-13, at 23-26, 75.

Plaintiff also showed very little in the way of functional limitation. His medical records consistently reported that he was not more than mildly limited in terms of mobility, range of motion, gait, or orthopedic maneuvers. In February 2009, plaintiff was sent to an orthopedic specialist, Dr. Matthew Pouliot, who noted a negative nerve conduction study/EMG, essentially normal MRIs, and little problems with gait, station, and range of motion. Dkt. 8-12, at 14-15. Dr. Pouliot prescribed trigger point injections and ordered plaintiff to stay off work for one month. Dkt. 8-12, at 15. Plaintiff reported relief from the injections. Dkt. 8-12, at 21. During a March 2009 appointment, Dr. Pouliot noted a largely normal examination and anticipated plaintiff being able to return to work in April. Dkt. 8-12, at 21. During an appointment in later March 2009, plaintiff was encouraged to begin an exercise program and was given additional

trigger point injections. Dkt. 8-12, at 22. In May 2009, Dr. Pouliot noted that plaintiff had made "some great improvements," but that he reinjured his back while mowing the lawn. Dkt. 8-12, at 25. Plaintiff was diagnosed with myofascial pain and muscle spasm and referred for acupuncture treatments. Dkt. 8-12, at 25. He was released to return to work on June 1, 2009. Dkt. 8-12, at 25.

Plaintiff, however, did return to work in June, as he insisted that his employer would not let him return unless he was 100% back to his baseline prior to his injury. Dkt. 8-13, at 47. Dr. Pouliot noted, however, that plaintiff had normal range of motion and strength. Dkt. 8-13, at 47. During a visit with his primary treating physician, Dr. David S. Richman, on June 26, 2009, plaintiff reported "slowly improving" back pain and Dr. Richman noted plaintiff's normal gait, station, and coordination. Dkt. 8-13, at 44-45. However, by July 1, 2009, plaintiff was reporting that his pain was getting progressively worse, despite a largely normal evaluation. Dkt. 8-13, at 42-43.

Plaintiff returned to another treating physician, Dr. John G. Fan, on July 6, 2010, complaining of chronic low back pain. Dkt. 8-13, at 31. However, Dr. Fan was unable to complete a physical examination because, after discussing a possible psychological evaluation to rule out malingering, plaintiff, who was accompanied by his daughter, became very emotional and angry and demanded that Dr. Fan complete disability paperwork. Dkt. 8-13, at 31. Dr. Fan reported in his encounter notes:

> Before the physical examination, we discussed the psychological evaluation to rule out melligering[sic]. The patient's daughter and the patient were getting emotional and angry to me and to my nurse, Jamie. I advised the patient to calm down; otherwise, I will call the security people for protection. The patient's daughter and the patient left my office . . . I need psychological evaluation for further evaluation. Patient and his daughter refused it."

Dkt. 8-13, at 31.

10

As the ALJ noted, this pattern is repeated time and again. Plaintiff's medical records are replete with allegations of severe pain with little to no corresponding objective structural problems. During a visit to the Kansas Joint and Spine Institute on July 28, 2010, Dr. Camden Whitaker noted that plaintiff had no problem with orthopedic maneuvers, had only minimal tenderness upon palpation, normal strength, and only a slightly reduced range of motion. Dkt. 8-12, at 77. Dr. Whitaker concluded that there were no surgical options available. Dkt. 8-12, at 77.

On August 3, 2010, Dr. Richman advised plaintiff that he should participate in physical therapy, as he had little in the way of structural problems. Dkt. 8-13, at 29. Plaintiff, or rather plaintiff's daughter, refused physical therapy. Dkt. 8-13, at 29. Dr. Richman also noted that plaintiff stared at the floor and "primarily let[] his daughter speak for him." Dkt. 8-13, at 29. Results from the Abay Neuroscience Center revealed no neurological deficits and no surgical options. Dkt. 8-11, at 61-62.

Furthermore, an investigation conducted by the Cooperative Disability Investigations Unit ("CDIU") on March 10, 2011, revealed that plaintiff could walk, stand, and bend with no apparent difficulty. Dkt. 8-14, at 40. Plaintiff was observed eating lunch in a restaurant and shopping in a mega-store measuring about 240,000 square feet. Dkt. 8-14, at 40.[2]

Based on its independent review of the record, as well as the ALJ's comprehensive decision, the court finds that the ALJ's decision to accord Dr. Albright's opinion little weight is based on substantial evidence. As such, plaintiff's second assignment of error is dismissed.

---

[2] It should be noted that the investigation and findings were also captured on video. Dkt. 8-14, at 20.

**C.     Failure to properly assess plaintiff's credibility**

Plaintiff next argues that the ALJ improperly discounted his credibility. He alleges that the ALJ relied heavily on the CDIU investigation, which allegedly "did not capture anything that would discredit [plaintiff's] pain and associated symptoms." Dkt. 16, at 5. Plaintiff claims that, if he *was* able to ambulate more effectively that day, it was because he had taken pain medication. Dkt. 16, at 5. However, he remembered struggling to move around. Dkt. 16, at 5.

A claimant's subjective complaints of debilitating pain are evaluated for credibility under a three-step analysis that asks:

> (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether the impairment is reasonably expected to produce some pain of the sort alleged (what we term a "loose nexus"); and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's pain was in fact disabling.

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166-67 (10th Cir. 2012) (citing *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987)). The ALJ "must consider the entire case record, including the objective medical evidence" to determine whether plaintiff's subjective claims of debilitating pain are credible. SSR 96-7p, 1996 SSR LEXIS 4, at *3 (July 2, 1996). The ALJ should consider "a claimant's persistent attempts to find relief for [his] pain and her willingness to try any prescribed treatment prescribed," regularity of contact with [his] doctor, possible psychological disorders that may combine with physical problems, daily activities, and daily dosage and effectiveness of medications. *Keyes-Zachary*, 695 F.3d at 1167.

The ALJ need not make a "formalistic factor-by-factor recitation of the evidence" if he specifies evidence relied on in the credibility analysis. *Id*. (citing *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)). "[A] credibility determination 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record' and be 'sufficiently specific'

12

to inform subsequent reviewers of both the weight the ALJ gave to a claimant's statements and the reasons for that weight." *Hayden v. Barnhart*, 374 F.3d 986, 992 (10th Cir. 2004) (quoting SSR 96-7p, 1996 SSR LEXIS 4, at *12).

Recognizing that "some claimants exaggerate symptoms for the purposes of obtaining government benefits," (*Bolan v. Barnhart*, 212 F. Supp. 2d 1248, 1260 (D. Kan. 2002) (citing *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987)), an ALJ's credibility determinations are generally treated as binding on review. *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990); *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983). "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence. *Wilson*, 602 F.3d at 1144; *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). The court cannot displace the ALJ's choice between two fairly conflicting views even though the court may have justifiably made a different choice. *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007). However, notwithstanding the deference generally given to an ALJ's credibility determination, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Wilson*, 602 F.3d at 1144 (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1998)).

At steps one and two, the ALJ determined that plaintiff established pain-producing impairments that could reasonably be expected to cause the alleged symptoms. He then proceeded to step three, weighing plaintiff's subjective complaints of physical limitations against objective medical evidence relating to physical symptoms. While the ALJ did rely, at least partially, on the results of the CDIU investigation, the investigation was not the sole basis for his determination of credibility. The ALJ noted that the objective evidence contained "exaggeration

of symptoms, or in the least suggests that there [was] a problem corroborating the claimant's allegations with any objective medical evidence." Dkt. 8-3, at 25.

The ALJ discussed in detail the physical exams and medical imaging performed by plaintiff's treating physicians, Drs. Richman, Pouliot, and Fan, which all consistently revealed benign clinical findings and little in the way of functional limitation. The ALJ also noted the findings of state medical consultant Dr. C.A. Parsons, who limited plaintiff to a light exertional level with postural restrictions on activities of crouching, kneeling, and overhead reaching. Dkt. 8-4, at 26-31.

The record contains substantial evidence supporting the ALJ's determination of plaintiff's diminished credibility. The ALJ's analysis of plaintiff's daily activities and inconsistencies between his claims and other objective medical evidence is sufficiently specific to demonstrate the ALJ's reasoning and the weight given to plaintiff's claims. As such, plaintiff's third assignment of error is dismissed.

### D.     Failure to pose a complete hypothetical to the VE

Finally, plaintiff alleges that the ALJ's reliance on the testimony of the VE is misplaced because those responses were based on an incomplete hypothetical question that did not take into account plaintiff's special education and inability to read and write. Dkt. 16, at 5.

As a general rule, "[h]ypothetical questions posed to the vocational expert must reflect with precision a claimant's impairments, *but only to the extent that they are shown by the evidentiary record.*" *Hawkins v. Astrue*, 2011 U.S. Dist. LEXIS 110221, at *14 (D. Kan. Sept. 27, 2011) (citing *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996)) (emphasis added). Here, the court finds that the ALJ propounded a hypothetical to the VE that was supported by the record. As such, plaintiff's fourth assignment of error is dismissed.

**IT IS THEREFORE ORDERED** this 14th day of July, 2015, that the judgment of the Commissioner is affirmed.

<u>s/J. Thomas Marten</u>
J. THOMAS MARTEN,
CHIEF JUDGE